IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 10, 2011

**STATE OF TENNESSEE v. MATTHEW KINNARD**

**Direct Appeal from the Criminal Court for Putnam County**
**No. 09-0985    Leon C. Burns, Jr., Judge**

**No. M2010-02448-CCA-R3-CD - Filed July 27, 2012**

A Putnam County Grand Jury returned an indictment against Defendant, Matthew Kinnard, charging him with one count of aggravated child abuse. Following a jury trial, Defendant was convicted of the lesser-included offense of reckless aggravated assault. He received a sentence of three years in the Department of Correction. On appeal, Defendant argues that the trial court erred in denying his request for probation or some other form of alternative sentence. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

John Phillip Parsons, Cookeville, Tennessee for the appellant, Matthew Kinnard.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall A. York, District Attorney General; and Beth Willis, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

*Trial*

Nickolina Provost testified that Defendant is the father of the victim, who was born on December 2, 2007. Although Ms. Provost had primary custody of the victim, Defendant was allowed to visit the victim anytime that he wanted. She explained that Defendant

initially got the victim on the weekends, and later on, the victim alternated staying two weeks with her and two weeks with Defendant. On Friday, November 6, 2009, the victim went to spend the weekend with Defendant. On Sunday, November 8, 2009, at approximately 12:30 p.m., Ms. Provost received a call from Defendant indicating that he needed her to pick up the victim because the child had fallen and could not walk. She could hear the victim crying in the background. Ms. Provost testified that Defendant was upset and scared and said that he did not know what to do. She asked Defendant if he had called an ambulance, and he said, "No." Defendant's sixteen-year-old brother was also at the apartment at the time. Ms. Provost hung up, and her roommate, Cynthia Irick, drove her to Defendant's apartment on North Dixie Avenue.

When Ms. Provost arrived at the apartment, she knocked on the door, and Defendant's brother let her in. Defendant then handed the victim to her, she took him to the car, and Ms. Irick drove them to the Cookeville Regional Medical Center. Ms. Provost testified that the victim's leg was very swollen, and he was crying so hard that "he was barely able to catch his breath." She also saw a couple of "knots" on his head. Ms. Provost testified that although Defendant had a truck, he did not follow them to the hospital. She and Ms. Irick waited in the emergency room for approximately twenty minutes before the victim was called back for an examination. Ms. Provost testified that Defendant called while they were waiting and said that he would be at the hospital, but he never came. She said that Defendant indicated that he needed to do some laundry and that he needed time to calm down and "get himself together."

Ms. Provost testified that the victim was examined and given Morphine which helped him calm down. He was then transferred to Vanderbilt Children's Hospital in Nashville at approximately 3:30 to 4:00 that afternoon. Ms. Provost testified that she called Defendant and told him that the victim was being transferred; however, Defendant said that he could not go to Nashville because he had to work the following morning. She told Defendant that the victim needed him there, but Defendant never showed up. After the victim arrived at Vanderbilt, a brace was placed on his leg. The brace went from his foot up to his hip. He remained there overnight, and a cast was placed on his leg the following morning. Ms. Provost testified that Defendant constantly called to check on the victim but said that he could not make it to the hospital because it was too far to drive, and he had to work the next morning.

Ms. Provost testified that the victim was released from Vanderbilt at approximately 7:00 p.m. on Monday, November 9, 2009. Ms. Irick and Charles Bradley picked her and the victim up and drove them home to Cookeville. Ms. Provost spoke with Defendant a few days later, and Defendant told her that the victim had fallen off a concrete area along the side of the apartment building. Ms. Provost testified that the victim had to wear the cast for five

weeks, which was very difficult for a two-year-old child. On the day the victim's cast was removed, Ms. Provost received a different story from Defendant's mother of what happened to the victim. Ms. Provost confronted Defendant with the information, and he said that he had been playing with the victim on the bed, rolling around, and the victim fell off the bed. Defendant also told her that the previous night, November 7, 2009, he went out for a few drinks with friends and that he was "f'd up." Ms. Provost noted that Defendant's bed consisted of a mattress and box springs on the floor that was "maybe" a "couple of feet" high.

On cross-examination, Ms. Provost testified that the victim began living with Defendant in December of 2008 because she lost her place to live. Defendant took care of the victim until mid-February of 2009, when Ms. Provost began keeping the child during the week, and Defendant cared for him on the weekends. Ms. Provost admitted that she did not see the child very often during the period of time that he lived with Defendant because she was essentially homeless. She said that Defendant seemed extremely excited when he found out that he was the victim's father, and she had no fears with leaving the victim with him on the weekends. She had never seen any other bruises or marks on the child.

Ms. Provost testified that she had her electricity cut off and lost her apartment in June of 2009, and the victim moved back in with Defendant. She said that he lived with Defendant until mid-August of 2009, and Defendant did a great job with the victim. Ms. Provost testified that the victim again moved back in with Defendant in September of 2009 while she attended outpatient drug rehabilitation which was suggested by the Department of Children's Services (DCS). During that time, DCS considered Defendant's fitness to care for the victim. Ms. Provost completed the rehabilitation program on October 24, 2009, and the victim came back to live with her a few days later.

Ms. Provost testified that Defendant was upset and crying when he called her to come get the victim on November 8, 2009. She said that he did not act like he was intoxicated or high at the time. Ms. Provost testified that police showed up at the Cookeville Regional Medical Center within an hour after she arrived with the victim and began asking her questions. She told them what Defendant had told her. Ms. Provost testified that the police told her that no one could come back and see the victim until they spoke with her, and she told Defendant that he could not come back there. After she talked with police, Ms. Provost was allowed to bring others back to see the victim, and she called Defendant and told him that he could see the child. She also said that they were waiting to go to Vanderbilt at any moment. Ms. Provost testified that Defendant was still upset when she talked to him, and he asked for details about the victim. Ms. Provost testified that someone from DCS later came to Vanderbilt to speak with her. She was told by that person to not allow Defendant to be around the victim. Since then, Defendant was only allowed supervised visits with the

victim. Between November of 2009 and September of 2010, Defendant visited the victim more than twenty times. On five or six occasions, Defendant said that he could not see the victim because Defendant was out of town for work. Ms. Provost testified that Defendant had been a good father to the victim, and she would trust Defendant to be alone with the child. She did not believe that Defendant would intentionally hurt the victim.

On re-direct examination, Ms. Provost acknowledged that Defendant initially lied to her about how the victim broke his leg. She still had some "questions" about Defendant's second story of how the injury occurred.

Cynthia Irick testified that when the victim got into her car, she noticed that his "leg was swollen, and he was holding it, crying, saying, 'Ow, it hurts.'" She estimated that it was "about three times its normal size." Ms. Irick noticed a bruise on the victim's head, "like he had fallen." She said that Defendant was also crying as he put the victim's car seat in her vehicle. Ms. Irick testified that the Defendant never showed up at the hospital.

Officer Joe Greenwood of the Cookeville Police Department was dispatched to the Cookeville Regional Medical Center at approximately 2:00 p.m. on November 8, 2009. He spoke with Ms. Provost and Ms. Irick, and he observed the victim lying in the hospital bed with a red spot on his head. The child was scared and crying. Officer Greenwood then turned all of the information over to Detective Tammy Goolsby.

Detective Goolsby spoke with Officer Greenwood and learned that Defendant was possibly at the Handi-Mart Laundry washing clothes. She stopped by there on her way to the hospital but did not locate Defendant. When she arrived at the hospital, Detective Goolsby spoke with a nurse about the victim's injuries. She then went into the victim's hospital room and spoke with Ms. Provost and Ms. Irick. Detective Goolsby testified that the victim had been given a sedative and was laying in the bed with an "Ace bandage" around his mid-section and "completely down his left leg, the left leg, from the hip area all the way down to his foot, is clothed, or wrapped in an Ace bandage, and there's like a soft splint, where he can't move it." She also noticed a hematoma on the left side of the victim's head, and red marks on the left side of his forehead.

Detective Goolsby left the hospital, and she and Officer Josh Ward drove to Defendant's apartment at 1979 North Dixie, E-6. Defendant's truck was not there, and no one answered when she knocked on the apartment door. Neighbors then told her that Defendant had left forty-five minutes earlier. Detective Goolsby drove by Defendant's place of employment but did not find him. She spoke with Defendant by phone at 4:45 p.m. and asked him to come to the police station for an interview. Defendant indicated that he was on his way to his mother's house in Jackson County. Detective Goolsby told Defendant that she

needed to talk with him immediately about the victim and that he could visit his mother later. Defendant then said that he would be at the police station in fifteen minutes. Detective Goolsby waited forty-five minutes but Defendant did not show up. She called him again, and Defendant indicated that he was on his way there. He pulled into the parking lot thirty minutes later, at approximately 6:00 p.m.

Defendant agreed to talk with Detective Goolsby and gave the following information concerning the victim's injuries:

> He said that he had [the victim]. They were outside playing. He and his brother were outside on the side of the apartment. He was letting [the victim] play on the side of the apartment because he didn't want him playing in the parking lot near the street. And that he and his brother, [ ] were talking, had their back turned to [the victim], and all of a sudden just heard him screaming. He turns around and [the victim's] on the ground and telling him, "Oh, Daddy, hurt, hurt." And he goes over there and he picks the child - - he picks [the victim] up and takes him inside to check on his injuries. He said they noticed that his leg was messed up. He unclothed him, to look at his leg, because he couldn't walk. His leg was messed up. And that he called [the victim's] mother to come pick him up and take him to the hospital.

Defendant said that he called Ms. Provost instead of calling 911 because she had all of the "paperwork, the insurance and stuff on [the victim]." Detective Goolsby testified that Defendant did not go to the hospital because the victim was being transported to Vanderbilt, and he did not go to Vanderbilt because he had to wash clothes. The following day, Detective Goolsby drove to Defendant's apartment and observed the area where Defendant said that the victim fell.

Sergeant Yvett Deming later became the lead investigator in Defendant's case because of her specialty in the area of child abuse. On Monday, November 9, 2009, she reviewed all of the information in the case and called Defendant to set up an appointment to meet with him. Sergeant Deming testified that Defendant gave a short statement over the phone of what happened and agreed to meet with her on Tuesday, November 10, 2009, before his meeting with DCS. When Defendant arrived for the interview, Sergeant Deming advised him of his *Miranda* rights, and he signed a waiver. They discussed DCS' involvement in the case, and Defendant gave her some background information on himself. Defendant told Sergeant Deming that he picked the victim up on Friday, November 6, 2009, and had him until Sunday, November 8, 2009. Defendant's brother also spent the weekend with him and the victim.

-5-

Sergeant Deming testified that Defendant told her that he went out sometime late Saturday evening and left the victim with his brother. When he arrived back home early Sunday morning, Defendant's brother and the victim were asleep on Defendant's bed. The brother then went into another room, and Defendant laid down with the victim and slept. Defendant said that when he woke up at approximately 11:00 a.m. on Sunday morning, the victim was already awake. Defendant told Sergeant Deming that he and Defendant's brother took the victim outside to play, and he drew a diagram of the area and steps where the victim was playing and allegedly fell. Sergeant Deming testified that she had been to the apartment and took pictures of the area, and measured the height of the top step, which was seventeen inches.

Concerning the fall, Defendant told Sergeant Deming:

So, he said he heard him screaming, he turns around, he's lying on the ground. He goes to him. And he's clothed at that time. And he said there - - he picked him up. He said there was some stiffness in his leg, and that when he picked him up, he heard the bone crack. He actually makes a cracking sound describing what he hears. He describes it a number of times, that it crashes, it cracks, he hears it, it falls, and he knows that he's probably whatever has happened , he's made it worse.

Defendant said that he then took the victim inside, removed his clothing, and looked at the child's leg. He claimed that it did not look that bad so he called Ms. Provost, who had the child's "paperwork." When Sergeant Deming asked Defendant why he did not call 911, Defendant did not give a definite explanation, but he later gave seven or eight different reasons why he did not call 911 or go to the hospital. Those reasons included: that he had to do laundry; that his brother had school the next day, and Defendant needed to take him home; and that it would take a long time at the hospital. Defendant also said that he freaked out and did not know what to do and that he went to the laundromat to think about everything.

Sergeant Deming questioned Defendant further about the details of how he handled the victim after picking him up from the fall. She said:

He describes to me that the child's left leg is injured, and that he is on the right side of the child. The child is lying down. That he uses his right hand to scoop under the child's legs, and grabbed the calf of the injured leg with his right hand. Then he takes his left hand and places it on the neck of the child, to pick him up that way, and that he may have twisted the injured leg outward, turned it outward possibly.

Sergeant Deming testified that she doubted Defendant's story because it did not seem possible for the victim to fall such a short distance, and "that he could pick the child up that way and break the femur of the child's leg."

Sergeant Deming then attempted to get a statement from Defendant's brother, but she had some trouble reaching him. She finally spoke with his mother. At some point, Sergeant Deming obtained new information and attempted to schedule another appointment with Defendant. She was unable to reach him but she set up a recorded phone conversation between Defendant and Ms. Provost. During the call, Defendant's story changed. He said that he was not going to lie anymore and that he would talk to Sergeant Deming. Defendant said that he had gone out the night before and gotten "f'd up." He admitted that he accidently pushed the victim off the bed and that his body went in one direction and his leg went in another. Sergeant Deming testified that she eventually located Defendant's brother who also gave a statement. Defendant's brother said that Defendant "swiped" the victim off the bed.

Dr. William Smith worked in the emergency room at the Cookeville Regional Medical Center. He explained that the femur is located between the hip and knee and is the largest bone in the body. Concerning the difference between the bones of adults and children, he said: "Children's bones are in some varying stages of development. They are still growing. As such, there are, what the textbooks would call, growth plates, the area that the bone is actively growing." He further testified: "Part of that difference is, the bones haven't developed as well; they aren't as hard as the bones in an adult." Dr. Smith noted that a child's bones are more difficult to break because "they have [a] somewhat more degree of flexibility." He testified that a spiral fracture is a "fracture in which there is force applied, both in one direction, and also a twisting motion." It takes a significant amount of force to cause that type of injury. Dr. Smith noted that a spiral fracture causes a significant amount of pain.

Dr. Smith saw the victim at the hospital on November 8, 2009, in the emergency room. He spoke with the victim's mother and obtained a history from her of the child's injuries. She said that the victim had fallen down some steps. Dr. Smith testified that the victim had significant swelling and tenderness to his left mid-thigh, and "multiple areas of swelling about the head." The child was obviously in pain, so he was given Morphine and Zofran. Dr. Smith testified that x-rays were taken of the victim's femur which revealed a "significant fracture of the mid[-]part of the femur." The injury was inconsistent with a fall from two or three feet, falling from a stair, or a mattress and box springs. Dr. Smith testified that a splint and bandage were applied to the victim's leg, and he was transferred to Vanderbilt Children's Hospital.

On cross-examination, Dr. Smith testified that he saw the victim at 1:20 p.m. on November 8, 2009, and the child was transferred to Vanderbilt at 2:45 p.m. He said that the fracture to the victim's leg, based on his interpretation of the x-rays, was a spiral fracture. Concerning the difference between an oblique and a spiral fracture, Dr. Smith said:

> A spiral fracture has - - part of the force applied to the bone is a twisting mechanism. In an oblique fracture, there is force applied in one direction. If I were to take a dead tree branch from my back yard, hold one end in each hand and snap that tree branch over my knee, that would be an oblique fracture. If I tried to take that same tree branch and twist it, as if I was ringing out a wet towel, that would create a spiral fracture.

Dr. Smith later read the x-ray report which stated: "An oblique fracture of the mid[-]femoral shaft with later displacement and angulation." He testified that in a child, a spiral fracture or an oblique fracture "has to have a very significant amount of force."

Defendant's brother testified on his behalf. He said that he lived with his mother and spent weekends with Defendant. He testified that Defendant was a good father, and he never saw Defendant mistreat the victim. He said: "[Defendant] fed his child every day. He went to work every day, more than just on [sic] the week. Every time I seen him, he was never out of diapers or anything. [The victim's] diaper was always changed. And I think he was a good father." He testified that Defendant also kept the victim clean and warm and treated the victim when he was sick.

Defendant's brother testified that Defendant got out of the shower at approximately 11:30 a.m. on November 8, 2009, and was putting his clothes on in the bedroom. The victim was also in the bedroom crying because he had "pooped" in his diaper, and Defendant spanked him. Defendant's brother said that the spanking was not bad and that Defendant changed the victim's diaper. He testified that the victim was on the bed, and he saw Defendant "kind of put his hand on [the victim's] back and rolled him." He said that Defendant was not mad, cursing, or yelling. He further testified:

> And I just seen [the victim] roll off the bed after - - after that. And I noticed he didn't get right back up, and so I went over there, and my brother picked him up, and I noticed his leg wasn't - - it looked different. So we looked at it, and, you know, he couldn't - - my brother was talking to him, making sure he was all right, asked him if he could move his toes, and he moved his toes. And he wasn't crying, but you could tell he - - you know, his leg was hurt, because he was saying it. And after that, he called his mom.

He said that Defendant did not go to the hospital because the truck would not start, and he later learned that police were looking for him.

On cross-examination, Defendant's brother testified that Defendant left the apartment on Saturday night, November 7, 2009, at approximately 9:00 or 9:30 p.m., and he saw Defendant the next morning about 6:30 or 7:00 a.m. asleep in his truck in the parking lot. He testified that Defendant walked up the stairs to his apartment, and that he walked behind Defendant to make sure that his pants did not fall down because they were loose. He denied previously telling the prosecutor that he had to help Defendant up the stairs because Defendant was still intoxicated.

Defendant's brother testified that once inside the apartment, Defendant fell asleep on the bed with the victim, and that he (the brother) took care of the victim when he woke up at approximately 8:00 a.m. He said that Defendant woke up at 11:30 a.m. and took a shower. Defendant's brother testified that Defendant spanked the victim after he got out of the shower, but that he did not witness the event. When asked how he knew the victim was spanked, he said:

> Because I heard him telling him about pooping in his diaper. And which, I've lived - - I've lived with my brother long enough to know, that, you know, whenever his child didn't do right, I guess, he got a - - got a whipping, so I know when that is about to occur.

He testified that the victim was on the bed on his knees still whining after the spanking so Defendant "kind of took his hand on his back, and he rolled him." He further said:

> He rolled off the bed. And how he did that, he didn't do it in an angrily [sic] motion like that. He took his hand and he rubbed his back and swiped - - he just kind of did like that, and David rolled.

Defendant's brother testified that the victim did not get his leg caught in anything when he fell, and he was not crying when Defendant asked if he was all right. However, he said that something looked wrong with the victim's leg. He testified that Defendant initially told him not to tell anyone what happened. However, Defendant's brother eventually told his mother what happened, and she told everyone else. He said that he and Defendant went to do laundry after the victim was taken to the hospital.

*Sentencing Hearing*

Andrew Coffee, a probation officer with the Tennessee Board of Probation and Parole, testified that he prepared the presentence report in Defendant's case. He said that Defendant's drug screen was negative. Mr. Coffee that Defendant had been employed by RSC Construction for five years, and he visited a job site where Defendant was performing some concrete work. He said that Defendant reported that he graduated from Cookeville High School in 2004, but Mr. Coffee was unable to verify that information because the school did not reply to his request for a transcript.

Concerning Defendant's prior criminal record, Mr. Coffee testified that in addition to traffic offenses, Defendant was convicted of theft up to $500, which was committed on January 16, 2005. He received a sentence of eleven months, twenty nine days, a one-hundred and fifty-dollar fine, and "PSI probation." When asked if Defendant completed his probation in that case, Mr. Coffee testified:

> I found that he violated the terms of that probation. He was ordered to serve 15 days in jail and complete 24 hours of community service work. And then on August the 2nd of 2006, that violation of probation was dismissed.

Mr. Coffee assumed that the probation violation was dismissed "upon his completion of the community service work." He said that Defendant had several other charges that were dismissed, and his juvenile record contained charges for domestic assault, aggravated sexual battery, and being a runaway that were dismissed.

Nickolina Provost testified that she had custody of the victim, and Defendant had supervised visits with him. She said that since Defendant had been out of jail, he had been visiting the child. Ms. Provost testified that she appeared in "DCS Court" the previous day, and the victim's case was now closed. She said that Defendant was "under a program that he has to go through, the Steven Center, for a year of therapeutic, I guess parenting classes, before he actually gets anything unsupervised." Ms. Provost testified that Defendant acted appropriately during his supervised visits with the victim, and since his release from jail, he was paying child support and providing for the child.

## II. Analysis

Defendant contends that the trial court erred in denying his request for probation or split confinement. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett,* 49 S.W.3d 250, 257 (Tenn.2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the

determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, " 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn.1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo.* *Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App.1992)).

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002)

A defendant is no longer entitled to a presumption that he or she is a favorable candidate for probation. *Carter*, 254 S.W.3d at 347. Our sentencing law, however, provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. T.C.A. § 40-35-102(5), (6). Additionally, a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. *Id*. § 40-35-102(6). We note that "the determination of whether the [defendant] is entitled to an alternative sentence and whether the [defendant] is entitled to full probation are different inquiries." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing his or her suitability for full probation, even if the defendant should be considered a favorable candidate for alternative sentencing. T.C.A. § 40-35-303(b); *Boggs*, 932 S.W.2d at 477. In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether incarceration is appropriate, the trial court must consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant....

T.C.A. § 40-35-103(1); *see also Carter*, 254 S.W.3d at 347.

Because he was convicted of a Class D felony, Defendant is considered a favorable candidate for probation. *See* T.C.A. § 40-35-102(6). In considering Defendant's sentence, the trial court said:

The thing that sort of sticks out in my mind, Mr. Kinnard, here is, the proof, as suggested, it was a spiral fracture. I know there was a dispute about that. As I remember, the x-rays, one doctor says one thing, one says another, but - - which would be a twisting motion kind of a fracture. You've got a victim who's two years old, or thereabout. I don't remember the exact time frame. I've got a father who otherwise appears to have been a responsible person, but that occasion, or the night preceding this incident, is out, I won't use his words, but messed up. And I take it from that, drugs and alcohol. I also note in the report here that, "was still smoking marijuana up until just about a month ago." I believe that's what that says. Is that right?

So, how do we protect children? How do we say to the Matthew Kinnards, and Leon Burns, and the Phillip Parsons, and others who might have children to be responsible for, how do we say to them, "You will be held accountable if you don't conduct yourself properly," unless we respond to what has happened here, a conviction, by imposing some punishment? So the legislature has given us some guidelines to go by.

The state has suggested that there were enhancing factors that would be appropriate, and [the Assistant District Attorney] suggests that one would be a previous history of criminal convictions. Although minor, I guess, in one sense of the word, we do have some exposure here. A conviction of a theft

-12-

charge. There's traffic tickets. Speeding. I guess a taillight or something, wasn't it? A seat belt law. Speeding 91 in a 55 mile zone. That's a pretty flagrant disregard for the safety of others. Many times that's considered to be reckless driving, or a reckless endangerment.

I don't remember why the probation was revoked to serve 15 days, but that certainly suggests that you have been released and you failed to comply with the conditions of being released in the community and on probation.

I also think that the [sic] pointing out, "The victim was particularly vulnerable because of age" is appropriate. A two-year-old, you have to watch constantly and be with, and you have to take care of them, and you can't turn them loose.

Mitigating factors, possible "The offense was committed under unusual circumstances that it is unlikely that a sustained intent to violate the law motivated criminal conduct." I suppose that is appropriate and has some bearing, because I don't - - I just don't believe you're the kind of person who would have a sustained intent to do this kind of thing. It [sic] just a bad thing.

But the circumstances of this incident, and the circumstances that led up to this incident are such that we can't say, "Well, it was just an accident, let him go home." We do, as was pointed out, review the purposes of punishment and sentencing considerations, and certainly one of the reasons why sentences are imposed is to [deter] the general public and those who might be likely to violate the law. And as I pointed out earlier, how do we send a message to those of use who are responsible for small children, and people who can't take care of themselves, unless we impose some sentence or punishment? And the very nature of this offense of a helpless victim would suggest that some confinement would be necessary to avoid depreciating the seriousness of the offense.

I guess another thing that sort of concerned me, as I was reading the report yesterday, there were different stories given about how it happened. "He fell off a concrete ledge of a couple of feet," or something like that, "and I grabbed him," and then it ended up, knocking him off the bed. And maybe if that's the real story, it seems to me, that was likely done in a fit of anger at the child as opposed to an accidental turning and doing this kind of thing. At least that's how I see it.

All and all, as difficult as it is, you've got some good things going for you. You're employed, it sounds like for a substantial period of time. That's way ahead of a lot of the people we see here, and that is good.

But I think, just for the reasons that we can not depreciate the seriousness of this offense, a helpless child being knocked off a bed, if you want to go with that story, after a big night out on the town being drunk, and hung over, or whatever, that just, in my book, requires some time. The range is two to four. I think the mitigating factors here would bring it down some, and I think a three-year sentence would be appropriate to serve.

And again, in setting that particular sentence I've considered all of the facts in the case, the pre-sentence report and all of the pleadings.

The record in this case supports the trial court's findings. In addition to some traffic offenses, Defendant has a prior conviction for misdemeanor theft. The probation officer testified that Defendant was given an "11-29 sentence, a hundred and fifty dollar fine, and PSI probation." When asked if Defendant successfully completed his probation, the probation officer testified that Defendant violated the terms of that probation and was ordered to serve fifteen days in jail and to complete twenty-four hours of community service work. He said that the probation violation was dismissed "upon his completion of the community service work." Defendant also told the probation officer that he began using alcohol at the age of nineteen and drank almost every weekend until the age of twenty when he went to work. Defendant admitted that he began using marijuana at the age of twenty and that he continued using it until less than a month before the presentence report was taken. This reflects negatively on his potential for rehabilitation.

In addition, the offense in this case was serious. Defendant left the twenty-three-month-old victim with his younger brother while he went out to "party" and returned the following morning in an apparent state of intoxication. Later that morning, the child suffered a broken leg that Dr. Smith described as a spiral fracture. He testified that a spiral fracture is a "fracture in which there is force applied, both in one direction, and also a twisting motion." Dr. Smith further noted that a spiral fracture causes a significant amount of pain, and it takes a significant amount of force to cause that type of injury. The victim also had an injury to his head. There was testimony from the witnesses at trial that the victim indeed was in a significant amount pain. Instead of calling an ambulance for the child after he was injured, Defendant called the child's mother to pick him up. Defendant gave conflicting explanations to the victim's mother and to the police about how the victim's leg was injured, first saying that he fell a short distance off a step outside of Defendant's apartment. Defendant later claimed that he rolled the child off of a mattress and box springs that were

sitting on the floor. On the presentence report, Defendant gave the following version of what happened: "He rolled off the bed and it broke his leg." However, this story in inconsistent with the medical testimony presented at trial. Dr. Smith testified that the injury was inconsistent with a fall from two or three feet, falling from a stair, or a mattress and box springs. Defendant's lack of candor about what happened to the victim, as implicitly found by the trial court, reflects negatively on his potential for rehabilitation. *State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995).

Based on our review, we conclude that the record supports the trial court's denial of Defendant's request for probation or split confinement. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE